## BETSEY A. TILLOTSON AND OTHERS *vs.* ROMANTA TILLOTSON AND ANOTHER.

*S* and *R* owned and worked a plantation in Louisiana together, and a farm in this state. *S* died in 1854, leaving a will by which he gave his property to his widow and children, and in which he stated it to be his special desire that all the joint property in Louisiana should be kept together and the business continued in partnership as it had been until all the debts were paid, or until such time as both parties should wish to dissolve the partnership, and that *R* should have the principal management. *R* continued the business until 1865, when a bill in equity was brought against him by the widow and children of *S* for a settlement of the partnership account. Held, upon facts reported by a committee,

1. That while it is ordinarily the duty of a surviving partner to pay the debts of the firm as speedily as he can do so from the assets, and to pay over their share of the residue to the representatives of the deceased partner, yet here *R* had a right, under the request of the will of *S*, to continue the business for the benefit of the representatives of *S* in common with himself.

2. That *R* was not entitled to compensation for his services in conducting the business after the death of *S*, there having been no agreement for such compensation to either partner in the lifetime of *S*, nor any agreement of his representatives for such compensation to *R*.

3. That *R* was to be allowed for money expended by him in supporting a preacher on the plantation, such having been the practice in the lifetime of *S*, with whom it was an object of special interest, and it being for the pecuniary interest of the concern in promoting the good behavior of the laborers.

4. That on the same ground he was to be allowed for reasonable expenditures upon the reparation of a building used as a place of worship.

5. That *R* was to be allowed for provisions of the value of $140, given away to relieve distress in the neighborhood, at the time of a crevasse in the Mississippi river causing great damage, it being found that this was in accordance with the habits of the firm before the death of *S*, and promotive of the common interest.

6. That *R* was to be allowed a large sum expended by him in attending upon Congress for the purpose of defeating certain legislation affecting injuriously the title to the plantation, and that the whole sum was to be allowed as a charge against the concern, although other proprietors were largely interested in the question and benefited by his labors, it having been found by the committee that he was not in fault for not having secured a contribution toward the expense from such other proprietors, and that large sums had been expended by the firm in the same matter during the lifetime of *S*.

7. That the charge for the money so expended by him was to be allowed although set down in his account in gross and without any schedule of items, this fact only constituting a consideration against the allowance and not a legal objection, and it being competent for the committee upon satisfactory evidence to allow the charge.

8. That the real estate in Louisiana, though by the laws of that state it could become partnership property only upon a written agreement to that effect, was yet to be considered as partnership property as between the parties to the suit, it having been purchased with partnership funds, S by his will having so recognized it, and all parties since his death having so treated it.

9. That a certain note given by R in the name of the firm after the death of S, in renewal of a firm note given before his death, was not to be considered as extinguishing the firm debt, and as the obligation of R individually, it being found that neither party intended to discharge the company debt, and that the new obligation had been considered by all parties as the obligation of the company.

10. That R was properly allowed payments made by him at eight per cent. interest on notes of the firm payable in Louisiana, in which no rate of interest was specified, although by the laws of that state the legal rate of interest was five per cent., but might be eight per cent. where so agreed in writing,—it having been found that there was an oral agreement when the notes were given that eight per cent. should be paid, and the payment of such interest being therefore the performance, though voluntary, of the agreement.

11. That notes dated in Louisiana, where the principal business of the concern was carried on, though made in fact in this state, were presumably intended to be paid there, and were therefore governed by the laws of that state.

12. That R was not to be charged with certain parish scrip which he had taken in the way of business in Louisiana, and which proved worthless, it being found that it was current money there at the time it was taken.

13. That R was to be allowed the expense incurred in building a large barn on the farm in Connecticut, although it proved, in view of the financial condition of the concern, an unwise expenditure, as he was not bound to manage the business solely with reference to closing up the affairs of the company, and the committee having found that if he was not so bound the expenditure was not an unreasonable one.

BILL in equity for an account, a discovery, and a settlement of a partnership account; brought to the superior court in Hartford county, and referred to a committee, who made the following report:

Prior to the year 1825 there was a partnership in the business of peddling clocks, subsisting between Giles Tillotson, Shubael Tillotson, Oliver Tillotson, and Romanta Tillotson, all then of Avon, in this state. These partners were brothers, and sons of Elias Tillotson; who died intestate, in the year 1812, leaving a small property, consisting substantially of the farm in Avon, hereinafter referred to, with the stock and utensils thereon. This estate was never distributed among the heirs of Elias, but remained together as a home for each member of his family until they respectively parted with their

Tillotson v. Tillotson.

interest in it. Two of the five daughters conveyed their interest in this estate to the five sons, October 12th, 1815; the other three daughters conveyed their interest to Giles, Shubael, Oliver and Romanta, September 28th, 1821, and Chauncey Tillotson, one of the five sons, conveyed his interest to Giles, Shubael and Oliver, August 11th, 1817.

The partnership between the four brothers in the business of selling clocks grew up without any formal articles of agreement, and the definite time at which each individual came into the partnership does not . appear. The business was widely extended, being carried on in the states of North and South Carolina, Mississippi, Louisiana, Ohio, and perhaps other states.

In the month of May, 1825, Shubael Tillotson purchased of one Pritchard an undivided half of a cotton plantation, with its stock and utensils, situated in the parish of Ascension, in New River section, in the state of Louisiana. This purchase was made with the knowledge and consent of the other partners, was intended by all of them to be for the use of the partnership, and was paid for with the partnership funds, but the title was taken by Shubael in his own name. After this purchase the plantation was cultivated and managed with Pritchard until May, 1827, when Shubael purchased of him the other half and took the title in his own name. This last purchase was also made with the knowledge and consent of the copartners, was intended to be for their benefit, and the purchase money was furnished from the common funds. From the time of the first purchase until the death of Shubael in 1854, the plantation and the other purchases of real estate by the firm, as hereinafter stated, were treated and considered by the partners as partnership property. The title to the various tracts of land, as the purchases were made, was taken sometimes in the name of Shubael, sometimes in that of Romanta, and sometimes in the name of both, but the consideration was in every case paid with partnership funds, and the purchases were intended for partnership uses; and no change has ever been made in any of these titles from the first, and they now stand as when the lands were first deeded.

The nominal consideration paid for all these lands amounts to the sum of $28,299. 25. Those which now stand in the name of Shubael Tillotson cost the sum of $18,565.25. Those which stand in the name of Romanta $7,735.85 ; and those standing in the name of S. & R. Tillotson $2,000.

For some time after the purchase of the plantation the clock business was continued as before, Oliver giving it his principal attention, while Shubael, and after a while Romanta also, gave their attention to the management of the plantation. Giles Tillotson became disabled by sickness, in the year 1828, from taking an active part in the business of the concern, and after that took little or no interest in its management, though his interest remained until his decease in 1841, when it was bought in by Shubael and Romanta. Soon after the second purchase of Pritchard, the plantation was turned by the partners from a cotton to a sugar plantation, and was so continued until after the rebellion in Louisiana with its consequences rendered the cultivation of sugar, at least as a sole crop, for the time impracticable, since which some cotton has been raised thereon. During most of the time, and down to the year 1862, a small store has been connected with the plantation, on the Mississippi river at a place used as a landing, merely as a convenience in conducting the plantation. This was a source of some profit, and belonged to the partnership in the lifetime of Shubael, and was, after his death, continued as before, in the interest of the plantation, until the summer of 1862, when it was given up. In 1834 Shubael and Romanta bought out the interest of Oliver in the partnership, and a division was made of the partnership property and other property owned in common, in which Oliver became the owner of the Avon farm, and the stock and utensils upon it. Oliver continued to be the owner of this farm until his decease, and in September, 1843, Shubael and Romanta purchased it of his legal representatives, with all its stock and utensils, paid for it with the partnership funds, and ever after, to the decease of Shubael, treated and considered it partnership property. In 1859, and with reference to the erection of a new barn as hereinafter mentioned,

Tillotson *v.* Tillotson.

a small addition, containing about one-half acre of land, was made to this farm, at a cost of fifty dollars. This sum was paid from the common fund, but the deed was inadvertently taken in the name of Romanta in his absence.

It was understood and agreed between Shubael and Romanta that neither of them should have any individual property, (except clothing and personal ornaments,) but that all the estate, real and personal, standing in the name of either of them, should be regarded and treated as the property of both, in the same manner as if it stood in the name of the firm; and in the year 1836, at a time when most of their property and estate was located in the state of Louisiana, Shubael and Romanta executed a writing in relation thereto, in the words following : " This is to certify that all the property, both real and personal, which we or either of us hold or may hereafter possess in Louisiana, is and will be equally the property of both. Certified thereto, New Haven, Connecticut, September 10th, 1836. Shubael Tillotson, Romanta Tillotson."

Each of the parties had the most implicit confidence in the other, and engaged in and prosecuted the business of the partnership without any written articles of co-partnership, or any writing indicating the amount of the interest of each therein, except the one above given. During the whole copartnership, from its commencement, and before the interest of Oliver and Giles vested in Shubael and Romanta, and until the death of Shubael, it was the ___ ... standing and practice of the firm that each partner should have and take a reasonable and full support for himself and his family out of the partnership funds without any charge, or any account to be rendered therefor. The amount so taken from time to time was irregular, and varied between themselves according to the number and wants of their families. Shubael was married in 1825, and had two children who deceased at the ages of four and six years, and his wife deceased before the year 1836. On the 27th day of October, 1836, Shubael was again married, and the petitioner, Betsey Ann Tillotson, then became his wife. By this marriage he had three children, De. Witt, Florence and Genevieve, all of whom survived him.

Romanta was married in 1845, and had two children, who, with his wife, are still living. He has had a nephew of his wife's sister as a boarder in his family for two winters, and since the autumn of 1866 he has had two other of his wife's deceased sister's children in his family.

The partnership from its inception to the death of Shubael did not keep any regular books of account of their business. When the interest of Oliver and of the heirs of Giles was extinguished by Shubael and Romanta it was done by an equitable division, and on an estimate of the value of the partnership property remaining after the payment of the debts of the concern, without any statement of accounts as between themselves or any particular statement of their business.

Upon the plantation originally purchased of Pritchard there was during the life of Shubael, and still is, a mansion house occupied as a residence of the families of the partners when in Louisiana. At the decease of Shubael there was also a valuable sugar-house, with expensive apparatus and machinery for the manufacture of sugar, and which were used in such manufacture. These sugar works continued to be so used after Shubael's death, under the direction and management of Romanta, until the state of things at the plantation and in Louisiana made them useless for the present, and they have become to a great degree valueless without the fault of Romanta. There were and are also a store, and dwelling-house connected therewith, and various tenements upon the plantation for the laborers employed on the estate.

The farm at Avon had, during the life of Shubael, and still has, a dwelling-house upon it, ordinarily occupied by the families of the partners and their agents, and the same has for many years, before and since the death of Shubael, been managed mainly by means of agents and hired laborers, and the products have been sold or consumed for family use. It could never have been a source of profit to the concern. It was the old homestead of the family, and maintained as such, and also for a place of occasional residence as aforesaid.

Shubael died at Avon, November 22d, 1854, leaving a will

duly executed in the state of Connecticut to pass real and personal estate in this state and in Louisiana, dated October 21st, 1854, which, on the 15th day of December, 1854, was proved in the court of probate for the district of Avon, in this state.    In the will the petitioner, Betsey Ann Tillotson, was named the sole executrix.    She accepted the trust and gave bonds according to law, and then became, and ever since has been, duly qualified to act as such executrix. On the 8th of January, 1855, the said Betsey Ann Tillotson was by said court of probate appointed guardian of her children, DeWitt, then being about seventeen years of age, Florence, then being about seven, and Genevieve, then being about two years of age.    The principal provisions of the will were as follows :

"I give and bequeath to my wife, Betsey Ann Tillotson, her heirs and assigns, one half of· all my property, both real and personal.    I give and bequeath to my three children, De-Witt, Florence, and Genevieve, the other half of my property, the same to be equally divided between them.

" It is my special wish and desire that all the property owned by myself and my brother, Romanta Tillotson, of New River, parish of Ascension, and state of Louisiana, in partnership, be kept together, and the business continued in partnership, as it is and has been, until all the debts are paid, or until such time as both parties wish to dissolve the copartnership.    It is further my special wish and desire that for the present my brother Romanta should have the charge or principal management of the business of the firm, and that the expenses of each family, and the expenses of my son DeWitt's preparatory and collegiate education, together with the education of my other children, should come out of the property of the firm.    I further desire and wish the property which is in my name, and that which is in my brother Romanta's name, to be considered company property, and to be equally divided between my family and my brother Romanta's."

Shortly after the death of Shubael, Romanta, then being in Louisiana, was made acquainted with the contents of the will, and by consent of the said Betsey as executrix and

guardian the business of the concern was undertaken to be conducted as pointed out and requested in the will, and thenceforward it went on under the principal and substantially exclusive direction and control of Romanta, in the same manner in which it had been conducted before the death of Shubael. The expenses of the family of Shubael, and of the education of his children, and the expenses of Romanta and his family, and of the education of his children, were defrayed out of the funds of the concern as before, without being charged to any particular account. The said Betsey repeatedly visited Louisiana, and resided with Romanta at the plantation, sometimes with all her children, and at other times with one or more of them. At other times they resided for a large part at the Avon farm as they chose. Romanta spent the larger part of his time in Louisiana, conducting the affairs of the concern there, but he spent more or less of the summer months with his family at the Avon farm. The business of the concern continued to be carried on in the firm name of S. & R. Tillotson, until the summer of 1859, when Romanta received notice of the passage of an act by the legislature of Louisiana in the spring of that year, rendering it penal for a person to transact business in the name of a partner not interested in the firm. Thereupon he changed the name to that of " Romanta Tillotson." This was done in the month of May or June, 1859, and continued to be the name under which the business of the concern was transacted until the month of November, 1860, when the said Betsey and De-Witt, who had then attained the age of twenty one years, objected to the business being so done, and insisted that their interest should appear in the name in which the business was transacted, and thereupon, with the consent of the executrix and DeWitt, the name was again changed to " R. Tillotson & Co.," under which designation the affairs of the concern have ever since been conducted. For several years after the death of Shubael, the management of the business by Romanta seems to have had the assent and approval of the said Betsey. He gave her such information of the indebtedness of the concern as with her personal knowledge, obtained by her occa-

sional visits to Louisiana, would enable her to have a general knowledge of its affairs, until after DeWitt came of age.    In the fall of 1860 there was some conversation respecting the name of the firm, as above stated, and on the 15th of January, 1861, the said Betsey, then being in Louisiana with De-Witt, at the plantation, addressed to Romanta a letter requesting him to give her a full account of all the receipts and expenses since her husband's death, and to allow her and De-Witt to take their share in the management of the business. In the meantime Romanta conducted the business of the concern in the same manner in which it had been conducted before the death of Shubael, with no exclusive aim to the payment of the debts of the concern and division of the partnership property, but as if the concern were in common, going on for the benefit of all interested; expending upon the estate as he thought was desirable for all, and supplying such moneys as were called for in the expenditures of both families, and furnishing more for the family of Shubael than for his own.    In all this he acted as he supposed in accordance with the spirit and meaning of the will, and with due fidelity.    Under this management there have been, since the death of Shubael, raised on the plantation and farm, sugar and other products in large amounts and value, which have in part been consumed by the families and their dependents, and a part, amounting to a large sum, has been sold, and the avails used by Romanta in paying the expenses of the business, meeting the expenses of the two families, paying the debts due from the firm at the death of Shubael, and repairs and other expenditures upon the Louisiana and Avon lands, as he deemed advisable for all concerned.    These last expenditures the committee find were proper, unless Romanta was bound by law to manage the business of the concern with a single eye to the closing of its affairs, the payment of its debts, and the division of the property as speedily as could be done without serious present sacrifice.

The committee find that Romanta has never used the funds of the concern or conducted its affairs with any purpose of prolonging the copartnership, or for promoting his own per-

sonal aggrandizement, or disproportionately between the two families for his own use and convenience or that of his family. He has continued the same management substantially up to the present time, except as hereinafter found with reference to the supplies and treatment of the petitioners since 1860, and the keeping of separate accounts between the two families.

In reference to the allegation in the bill that it was the duty of Romanta to appropriate the moneys received by him " to the payment of the debts owed by the copartnership at the time of the decease of Shubael, and to the legitimate purpose of bringing the copartnership to a close," and to the claim of the petitioners before the committee that he applied such moneys to other uses, and that the committee have allowed such application in stating the accounts between the petitioners and Romanta, the committee, at the request of the petitioners, find specially as follows :

The committee allowed the sum of $3,023.58 for payments made by Romanta for the support of a minister at New River, Louisiana. There were over one hundred slaves on this plantation, and the committee allowed these payments as a charge on the common fund, as well on the ground of its being for the pecuniary interest of the concern in promoting in this way the good morals and behavior of their servants, as from the fact that the duty of caring for their slaves in this way, in the relation in which they stood to them, had been recognized and acted on in the same ample manner by the firm in the lifetime of Shubael, and at his especial instance and entreaty. A building intended as a meeting house, and also for use as a school, had been built by the firm under the direction of Shubael before his death, on land belonging to the firm, being a part of this plantation, and a deed of the premises given to trustees to secure the object. In this expenditure Romanta was but acting in the course of business pursued in the lifetime of his brother, and ardently sustained by him. It is true that others besides these families and their servants had the benefit of this ministry, while much the larger part of the expense was defrayed out of the funds of this concern. But

the committee do not find that Romanta acted unreasonably in this, as the said Betsey A. Tillotson was aware of these expenses in a general way, although she supposed a larger portion of the expense was contributed by others than was actually done. On the same general ground the committee allowed the charge of Romanta for repairs to the building above mentioned, used as a meeting house, to the amount of $173.00. If the court shall be of the opinion that the committee erred in allowing these charges, they are to be deemed to have been taken by him from the funds of the concern as of the average date of January 1st, 1859. The expenditures for the school kept in the building the committee have not allowed.

In the year 1859 and 1860, Romanta erected on the Avon farm a new barn, larger and more expensive than was actually necessary for farming purposes, and the expense was more than the barn would increase the value of the farm if it were to be sold. But a new barn was then needed on this farm, and the pecuniary condition of the concern at that time was such that, unless Romanta was under obligation to conduct its affairs solely with a view to the payment of its debts and the closing up of the partnership as soon as might be, the expenditure was not unreasonable, and should be allowed, and was allowed by the committee. If the committee have erred in allowing the charge, and the court shall be of opinion that Romanta should be charged with the excess of the expenditure over what it actually adds to the value of the farm, then the committee finds that the sum of $1,500 should be charged to Romanta for such excess, as of the date of January 1st, 1861.

In the year 1862, there was a crevasse in the Mississippi river, which was very destructive to property in all that region of country, and did great damage on this plantation, and produced great distress among the people of that neighborhood. In partial relief of this distress Romanta distributed to sundry poor people in his vicinity 129 barrels of corn in the ear, of the value of about $129, and 120 gallons of molasses, of the value of ten or twelve dollars. The petitioners insisted that he should be charged with the value of these articles.

The committee find that this expenditure was in accordance with the habits of the business of the firm before the death of Shubael, and was promotive of their common interest, and therefore allowed it. If the value of these articles should be charged to Romanta, the committee find that they amount to $140, and should be charged under date of January 1st, 1863.

There was a claim of title made by other parties covering all the land owned by these parties situated in Louisiana, and a very large amount of other lands belonging to other persons. The firm before the death of Shubael had expended considerable money in resisting this claim, but the claim was most persistently urged after that event, and congressional action was fraudulently obtained in derogation of the rights of this concern and of others in the same interest. In endeavoring to get this action reversed, which endeavor was to some important extent successful, Romanta spent a long time in Washington, and was at large expense, all of which the committee are of the opinion and find was done in good faith, and in strict accordance with his duty for the protection of the concern and the promotion of its interests. The others who shared in the advantages of this expenditure did not contribute to it, but the committee do not find that any blame is attributable to Romanta for this neglect, and they do find that it was his duty to make this expenditure for the interest of the concern, and have allowed his charges therefor. For part of the amount so allowed by the committee the petitioners made this special objection, that the entries of charge made by Romanta at or about the time of the transaction were too general, and ought for that reason to be disallowed, and especially so inasmuch as he could not at the hearing before the committee give any detailed statement of the entries, and relied solely on the entries themselves. The committee, from the whole evidence, were satisfied that the whole expenditure was incurred in good faith, and was for the interest of the concern, and therefore allowed it as above stated. The entries to which this special objection applies are as follows:

"1859, February and March. Expenses to Washington

and back, and contingencies, to defeat the Houmas claimants from turning the citizens out of home. Got Congress to pass an act to suspend all action of the government in the case to the end of the thirty-sixth Congress, so that the citizens may show the groundlessness of the alleged Houmas claim. $612.

"1860, May to June. Expenses at Washington on the Houmas swindle, (1859–60,) gross amount,     $3300
From which subtract expense of 1859 to Congress
and back,     -     -     -     -     -     -     612

$2688
And add, to J. J. Jones for writing documents,     350

$3,038."

At the death of Shubael the firm was indebted to various persons, in all to the amount of about $60,000. Romanta has paid this indebtedness, except the debt due to George Woodford, out of the funds of the concern. Both before and after the death of Shubael, the crops of the plantation were disposed of through a commission firm in New Orleans. The name of the firm was J. O. Woodruff & Co., and afterwards Alfred Moulton. The money transactions of the partnership, and, after the decease of Shubael, of the concern, under the management of Romanta, were chiefly through this commission house. The general habit and course of business always has been for the New Orleans house to furnish accounts current of the state of matters between them, including the proceeds of sales of the crops, and the payments upon them, and the advancements made to the concern. These accounts current were usually made once in six months, at the close of June and December. At the death of Shubael this commission house was largely in advance to the firm.

On the 15th day of January, 1861, the petitioner, Betsey A. Tillotson, and her son De Witt, then of age, were on one of their visits at the plantation, and the said Betsey addressed the letter of that date, before referred to, to Romanta. In answer to this Romanta placed all the accounts current he had received from the commission house up to that

date, in the hands of Betsey A. and De Witt, together with the plantation books in which he made entries respecting moneys and other plantation matters. These were the same books in which like entries had been made by the firm in the lifetime of Shubael, and were kept by Romanta as they had been kept before Shubael's death. There were no other books kept respecting these matters except the store books, which also continued to be kept in the same manner that they were when Shubael was living. They were as they ever had been, kept too imperfectly to show satisfactorily the result of each year's crop, or any perfect or full account of the business of the concern. This was true of the books prior to the death of Shubael, and to that time no statement of their accounts had ever been made or any balance agreed upon, and after his decease the additional care and responsibility thrown on Romanta in conducting the business of the concern effectually prevented an improvement in the mode of keeping their accounts, unless he had availed himself of more skilled aid in that department than the firm ever had. After keeping the accounts current and books for some time, Betsey A. and De Witt returned the same to Romanta without remark, and he went on thereafter in the business of the concern as before, except in reference to the charges for moneys advanced and goods taken up at the store by the two families. From this time, January, 1861, at the request of Betsey A. goods taken up at the store by the two families, which had theretofore been charged to the general plantation accounts, without discrimination, were charged to special accounts,—those taken for the family of Romanta being charged to his account, and those taken for the family of Betsey A. being charged in a separate account to her or them. The money taken by or furnished to either family was in like manner charged. A statement of the amount of moneys advanced to each family from January 1861, to October 24th, 1862, with a balance to that date, was furnished by Romanta to Betsey A. in November, 1862. At the same time he gave her an account of the then indebtedness of the concern, and had done the like previously, in the fall of 1857. Both Betsey Ann and De Witt

could have had access to the books and papers of the concern whenever they were in Louisiana, unless indeed at a later period, when in consequence of the war of the rebellion every thing was in a state of disorder, and a residence at the plantation was dangerous for Romanta, which was peculiarly the case in 1863.

On the 12th of January, 1863, Betsey A., then being at the plantation in Louisiana, with only her daughter Genevieve, addressed to Romanta another letter under that date, in which she complained of his management and demanded as early an adjustment of their affairs as could be made, that each member of the company might know the amount of his interest, and be able to make disposition of the same, or exert his rightful influence in the future management. At this time every thing was in confusion in Louisiana, and Romanta seems to have done nothing in reference to this letter. Before and after this time, and without the fault of Romanta, whatever of movable stock belonged to the concern, which does not appear in his account, had been or was carried off without compensation, in the irregular warfare and raiding going on in Louisiana at that time.

In the fall of 1863, De Witt, and his wife, Hattie Tillotson, one of the petitioners, joined the said Betsey Ann at the plantation. They all returned north in the spring of 1864, and have not since visited Louisiana. On the 8th of September, 1864, Romanta made his last advancement of money to the said Betsey Ann. This was for her and her daughters' use. He told her at this time it was necessary to economize, and he did not know when he should be able to let her have any more money. About the same time he advanced to said Hattie $100, which is the only sum in money advanced to her since the decease of her husband, which occurred June 3d, 1864. Romanta has since advanced Florence $30 for her wardrobe. Prior to 1861 there seems to have been no complaint of insufficient advances for the use of this family. The war of the rebellion began in that year, and the committee do not find any ground to say that under the circumstances of the times, and the state of the finances of the concern, the

advances, while they were made at all, and until after the advancement of $500, and of $100 made in September, 1864, should have been larger. In the spring of 1862 a destructive crevasse in the Mississippi river destroyed a valuable part of the sugar and molasses crop on the plantation, and after as well as before that time the condition of things in Louisiana growing out of the rebellion was extremely injurious to the prosperity of the concern. The loss of their property in slaves and the great difficulty in procuring the necessary help to carry on the plantation, have rendered the attempts of Romanta to conduct the same almost ineffectual, and the business has resulted in a loss. But the committee find that Romanta has exercised his best skill and discretion in the management of the business, and is not justly chargeable with any fault.

On the 31st day of December, 1864, there was standing to the credit of the concern on the books of their commission house, $7,626.75, but this was soon drawn out and expended in conducting the business of the concern, and in paying certain of its debts to the amount of over $2,500, which debts belonged in part to said Betsey Ann, and to compel the payment of which she, with the others interested therein, had commenced legal proceedings in Connecticut before payment was made. On the 15th day of July, 1865, there was to the credit of the concern with said commission house the sum of $1,102. On the 31st of August, 1865, Romanta paid said indebtedness to said Betsey Ann and others. On the 26th December, 1865, the concern was in arrear to said commission house $200.21, which arrears have ever since been increasing. There has been no large amount of money in the hands of Romanta since shortly after December, 1864, and the whole of it, with all the personal property of the concern, has been insufficient to pay the debts due on account of the concern. Since that time an immediate liquidation of the debts of the concern would have made it necessary to sell the Avon farm, and an indefinite part of the lands in Louisiana. The state of things now and for a long time past in Louisiana is and has been such that no one can say what the land

there would bring in market, and it is certain that an indefinite sacrifice on what has been their estimated value would have occurred on a forced sale, and the same state of things still continues.

In February, 1865, Francis Fellowes, Esq., of Hartford, was appointed by a written power of attorney to act for the petitioners in these matters. He notified Romanta of this fact, and requested him to render his account of the management of these concerns, and to furnish funds for the support of the petitioners. He also urged the sale of the Avon farm. Nothing came of this save a general statement or estimate of the indebtedness of the concern; and special inquiries as to the Woodford debt, made by said attorney, both of Romanta and Woodford, failed to obtain either the exhibition of the notes held by Woodford, or copies thereof, or any thing concerning them, save a general statement or estimate of the amount. Romanta has not furnished any money to the petitioners since the fall of 1864. He did, however, offer them a further advance in the latter part of the winter of 1864–5, of $300, if they would dismiss their legal counsel and forbear legal proceedings against him, which they declined to do.

The said Betsey Ann has expended of her own funds about $1,200, and has now left of a small patrimony inherited from her ancestors about $450. Except this sum the petitioners are destitute of all pecuniary means outside of this concern. In order to live the petitioners have been and are obliged to remain at the Avon farm, where they are subjected to the supervision and control in their household arrangements of George Woodford, one of the respondents. The supervision and control, both by Woodford and his wife, are exercised in an offensive and unwarrantable manner, and this has for some time been known to Romanta without any interference or rebuke from him. Woodford was engaged by Romanta to come with his wife and did come to the Avon farm to act as agent for the concern in the spring of 1863. This arrangement was with the cordial approval of Betsey Ann. Woodford is a nephew of Shubael and Romanta, was very highly esteemed by both, and had been for very many years in their

employment, both in Louisiana and elsewhere, and had acted for the firm as agent at the Avon farm during the life of Shubael. Both he and his wife were well known to Betsey Ann. After the difficulties in regard to the property had commenced Woodford took sides with his uncle Romanta, and in the intercourse between himself and wife at the Avon farm, and the petitioners, both before and after this litigation commenced, the feelings of the two parties became embittered more and more, and the supervision and control of matters connected with the agency by Woodford and wife became exceedingly offensive and annoying to Betsey Ann and Hattie. Woodford, in the early part of the year 1865, in anticipation and fear of legal proceedings on the part of Betsey Ann, attached the property at Avon upon a claim which he held against the concern, and in reference to certain insolvent proceedings thereafter instituted by Betsey Ann, and persons acting in her interest in this state, declared that if these proceedings were pursued the matter would not stop here, but that the Louisiana property would be proceeded against. These insolvent proceedings were however arranged, and no proceedings were instituted in Louisiana, and the writs of attachment by Woodford in Connecticut were by his direction never returned to court.

Woodford has not, either in connection with Romanta, or alone, been setting up grossly exaggerated or fictitious claims against the concern, nor have the petitioners ever had any proper reasons to suppose, nor is the fact so, that Woodford and Romanta have combined or confederated by means of any exaggerated or pretended claim with intent to absorb the partnership estate or to defraud the petitioners of their just rights therein.

DeWitt Tillotson was married on the 7th day of October, 1860, and his wife immediately became a member of the family of Betsey Ann, and has so remained to the present time. DeWitt died on the 3d day of June, 1864, leaving a widow, Hattie Tillotson, one of the petitioners, and also a will in which he gave all his estate to the said Hattie, and made her the sole executrix of his will. She accepted the trust, caused

the will to be duly proved in the probate court for the district of Avon, and gave bonds as the law directs.

There has been a very large diminution of the value of the estate belonging to the concern since the death of Shubael, but this the committee find is not justly attributable to Romanta. It is true that some of the seasons since Shubael's death have been very favorable, and the profits of those seasons have been large, but other seasons have been less propitious and serious losses have followed, and especially has the estate suffered largely by the emancipation of all the slaves that belonged to it, and the final results and effects otherwise of the war of the rebellion.

At the time of the decease of Shubael the firm was indebted to George Woodford, one of the respondents, by a note for the sum of $22,935.47, and by book in about the sum of $200. The note was dated New River, September 9, 1854, was in the handwriting of Shubael, and signed S. & R. Tillotson, payable on demand with interest, without specifying any rate of interest. The firm had for many years before the date of this note been indebted to Woodford in a large sum, and had uniformly made settlements with him annually. When this note was made the firm agreed verbally to allow eight per cent. interest to him, the same interest they were paying others at that time. The first settlement Romanta made with Woodford after the decease of Shubael was on the 9th day of May, 1856, when the interest on this note was computed at eight per cent. annual interest to that date, and a new note was given for the amount, being $26,091.38, payable on demand with interest without specifying the rate. The next settlement was made June 19th, 1857, at which time the interest on the note of May 9th, 1856, was computed at eight per cent. annually, and after deducting a payment then made, a new note was given for the balance due, being $28,754.56, payable on demand with eight per cent. interest. By the code of Louisiana interest is either legal or conventional. Legal interest is fixed at five per cent. on all sums which are the subject of judicial demand. The amount of conventional interest since 1844 can not have exceeded eight

per cent. and must be fixed in writing, and no testimonial proof of it is to be admitted by the law of Louisiana. The difference between the interest allowed by Romanta on the first of the settlements above named, and simple interest computed at five per cent., was $1,149.15, and was paid by him on the 9th day of May, 1856. The difference between the interest allowed by him in the settlement made June 19, 1857, and simple interest computed at five per cent., was $888.22. On the 19th of April, 1858, and April 19, 1859, settlements were made between Woodford and Romanta, and new notes were given at those dates respectively, stipulating the interest at seven per cent., and were signed in the company name of S. & R. Tillotson. June 18th, 1860, there was another settlement between the parties and a new note was given written for seven per cent. interest, and signed " R. Tillotson, for self and heirs of S. Tillotson." This last note was taken up March 4th, 1861, a settlement made between the parties, and a new note of that date for the sum of $24,243.68 was given, payable on demand with seven per cent. interest, which note is now held by Woodford, and which, with the interest computed to December 4th, 1866, amounts to the sum of $34,001.76. All the above described notes were dated at New River, in the state of Louisiana. This branch of the Woodford debt grew out of sums due him for services rendered the copartnership and a debt due from Oliver Tillotson to Woodford and assumed by the firm in their settlement with Oliver. There were large payments made upon this debt, and in the various settlements and substitution of new notes for antecedent notes as above written, it was never the expectation or intention of either party to have the firm discharged from the liability to pay this debt, and it has always been regarded and treated by all interested as a debt due from the concern. Woodford holds one other note signed " R. Tillotson & Co.," dated September 30th, 1863, for the sum of $1,138.40. This note was given for money loaned to and used by the concern, and, with the interest computed to December 4th, 1866, amounts to the sum of $1,355.45. Besides these two notes the committee find there is due Woodford for matters grow-

ing out of his agency at the farm in Avon, including his and his wife's services to October 5th, 1866, the sum of $7,388.28, making the whole debt of Woodford against the concern to December 4th, 1866, amount to the sum of $42,745.49.

The concern is also indebted to A. Moulton, successor to John O. Woodruff & Co., for advances made for the benefit of the plantation to August 10, 1866, the sum of $5,258.33. Also to the estate of DeWitt Tillotson, by a note dated August, 1852, for $25, which, with the interest to December 4, 1866, amounts to the sum of $46.64. Also to Mrs. Mary A. Tillotson, wife of Romanta Tillotson, by two promissory notes, one dated March 15th, 1863, for the sum of $801.43, and one dated April 18th, 1864, for the sum of $914, and both written for seven per cent. interest. These notes, with the interest to December 4th, 1866, amount to the sum of $2,091.81, and are dated at New River, Louisiana.

In stating the account between the petitioners and Romanta, the committee have not been able to ascertain with any exactness the amount received by each from the common fund before the 1st day of January, 1861. But they are satisfied and find that the amount before that time received by Betsey A. and her family was greater than the amount received by Romanta and his family. Since January 1st, 1861, Betsey A. and her family have received in money and other personal property, besides their board while at the Avon farm and at the plantation in Louisiana, the sum of $7,065.76, which, with the interest on the amount received each year from the end of the year to November 1st, 1866, amounts to the sum of $8,530.03. And Romanta and his family have received money and other like personal property, besides their board while at the farm and plantation, amounting to the sum of $6,957.24, which, with the interest in like manner computed to November 1st, 1866, amounts to the sum of $7,882.21. In addition to this sum the committee find that Romanta should be charged, and have charged him, with the balance due for money loaned to Rev. Mr. McKinney, the money loaned by him to Rev. Mr. Saxton, February 14th, 1860, the expenditure for school furniture, &c., at New River,

the money paid on account of Mary Hills, and the interest on these sums to November 1st, 1866, and all amounting to the sum of $1,459.07.

The committee further finds that the services of Romanta in this business have been worth to the concern $1,000 a year to the first of January, 1866, over and above his board and travelling expenses. But in consideration of the provision in the will of Shubael Tillotson, the relation in which the partners stood to each other and this concern in the lifetime of Shubael, and the relation which the representatives of Shubael and Romanta have borne to each other and this concern since the decease of Shubael, and all attending circumstances, the committee have not deemed it proper to credit Romanta for services before the first day of January, 1861, but they do find that he is entitled to receive compensation after that date, and have therefore credited him with the sum of $5,000 for all his services from that date to November 1st, 1866.

The committee find that all the money and property of the concern that has come to the hand and possession of Romanta or his agents, has been expended for the benefit of the concern, as hereinbefore stated, except such articles and money as have been by the committee charged to his account.

On these principles the committee state the account between the petitioners and Romanta respectively with the concern, as of November 1st, 1866, as follows, omitting as needless, in their view, any reference to other items:

The petitioners are indebted to the concern the sum of

$8,626.78.

Romanta is indebted to the concern the sum of       $4,341.28.

The local law of Louisiana, and its effect upon the subject matter of this suit, the committee have deemed advisable to refer altogether to the court, with the exception of their finding as above in regard to interest.

The assets of this concern at the present time consist of the Avon farm, and farming tools, stock and other personal property situated thereon and connected therewith, all of the value of about $17,000; also about five thousand acres of land in Louisiana, heretofore of great value, but at the pres-

Tillotson *v.* Tillotson.

ent time having no value which the committee can estimate; and personal property in Louisiana of various kinds, including eighteen bales of cotton in the hands of the commission merchant in New Orleans, all of the estimated value of $5,000. There is also upon the plantation at New River a quantity of machinery for the manufacture of sugar, which cost the concern a large sum, but is now of little value, but which may become valuable on a change of circumstances that will make the culture of the sugar crop practicable. In addition to the above there are a few debts due the concern, the value of which the committee cannot ascertain.

At the Avon farm and the Louisiana plantation the business is still going on, and the state of the account at Avon since October 6, 1866, and at the plantation since the settlement with the laborers for the year 1865, the committee have not the means of reporting. The averments in the bill and answer, otherwise than as above found, the committee negative as not found.

The petitioners remonstrated against the acceptance of this report, and the superior court reserved the questions of law arising on the remonstrance and on the report, and the question what decree should be passed, for the advice of this court. The points made by the remonstrance, and certain facts found by the court in relation thereto, sufficiently appear in the opinion.

*F. Fellowes* and *C. E. Fellowes*, for the petitioners.

*T. C. Perkins*, for the respondent.

PARK, J. One of the grounds of remonstrance urged by the petitioners against the acceptance of the report, grows out of the following action of the committee, as stated by them in their report: "The committee allowed the sum of $3,023.58 for payments made by Romanta Tillotson for the support of a minister at New River, Louisiana. There were over one hundred slaves on the plantation, and the committee allowed these payments as a charge on the common

fund, as well on the ground of its being for the pecuniary interest of the concern in promoting in this way the good morals and behavior of their servants, as from the fact that the duty of caring for their slaves in this way in the relation in which they stood to them, had been recognized and acted on in the same ample manner by the firm in the lifetime of Shubael Tillotson and at his especial instance and entreaty. A building intended as a meeting house, and also for use as a school, had been built by the firm under the direction of said Shubael before his death, on land belonging to the firm, being a part of this plantation, and a deed of the premises given to trustees to secure the object. In this expenditure Romanta was but acting in the course of business pursued in the lifetime of his brother, and ardently sustained by him. It is true that others besides these families and their servants had the benefit of this ministry, while much the larger part of the expense was defrayed out of the funds of this concern. But the committee do not find that Romanta acted unreasonably in this, as the executrix of Shubael was aware of these expenses in a general way, although she supposed a larger portion of the expense was contributed by others than was actually done. On the same general ground the committee allowed the charge of Romanta for repairs to the building above mentioned, used as a meeting house, to the amount of $173.00."

We fully agree with the counsel for the petitioners respecting the duties, liabilities, and authority of a surviving partner, that accrue to him by virtue of his survivorship. He holds the assets of the firm in trust primarily for the purpose of paying the partnership obligations, and, when they are extinguished, to account to the representatives of the deceased partner or partners for their share of the residue. He cannot prolong the business of the partnership further than is reasonably necessary in closing its affairs, and can do no act binding upon those interested in the assets of the firm not connected with the accomplishment of these objects. Story on Partnership, §§ 322, 324, 326, 327, 328, 344, 346, 347; Collyer on Partnership, §§ 129, 130, 131, 546; *Rudy* v. *Harding*, 6 Robinson, 70; *Carr* v. *Woods*, 11 id., 95.

But in the case under consideration the relation of Romanta to the assets of this firm is not to be considered as entirely that of a surviving partner. The petitioners represent the interest that Shubael had in the firm. They derive title under his will. In his will he declares, " It is my special wish and desire that all the property owned by myself and my brother Romanta Tillotson in partnership be kept together, and the business continued in partnership as it is and has been, until all the debts are paid, or until such time as both parties wish to dissolve the copartnership." It is true the partnership terminated at the death of Shubael, but the will authorized Romanta to continue the business of the firm until the time mentioned in the will should arrive. The testator had no authority over Romanta, to require him to continue the business ; hence this provision of the will is put under the form of a special desire that it might continue, but that he intended to bind his representatives should Romanta comply with his wishes is quite evident. It is common for testators to require that their property shall be invested in a certain way for a certain period, or that the business in which they are engaged shall be prosecuted for a certain time before distribution of their effects shall be made. *Pitkin* v. *Pitkin,* 7 Conn., 307 ; 1 Williams on Exrs., 88, and note. Shubael did not contemplate an early settlement of the affairs of the partnership. The business, no doubt, was prosperous at the time, and he entertained the expectation that all the debts of the concern would be paid out of the profits of the business ; which probably would have been the case, had it not been for the disastrous civil war that desolated the plantation. The case finds that Romanta acted in accordance with this provision of the will, that he conducted the affairs of the partnership in the same manner in which they had been carried on in the lifetime of Shubael, and that in the expenditures in question he acted in good faith for the best interest of all concerned. It was clearly the expectation and desire of Shubael that such expenditures should be made, and we think that, taking into consideration the will, the good faith of Romanta in making the expenditures, the relation that he and the pe-

titioners. bore to their slaves upon the plantation, the benefit resulting to the petitioners in consequence of the expenditures, the previous practice of the firm, and all the facts of the case, there is no cause for complaint on this ground.

These considerations apply with equal force and effect to the value of the articles given in charity by Romanta when a crevasse in the Mississippi river produced great distress in that region.

The next objection to the acceptance of the report is based upon the following finding of the committee :—" In the years 1859 and 1860 the said Romanta erected on the Avon farm a new barn, larger and more expensive than was actually necessary for farming purposes, and the expense was more than the barn would increase the value of the farm if it were to be sold. But a new barn was then needed on this farm, and the pecuniary condition of the concern at that time was such that, unless Romanta was under obligations to conduct its affairs solely with a view to a payment of its debts, and the closing up of the partnership as soon as might be, the expenditure was not unreasonable, and should be allowed, and was allowed by the committee."

The view we have taken of the case disposes of this objection. We have seen that Romanta was not under obligations to conduct the affairs of the partnership with a view to the immediate closing of the business, and unless this was the case the committee have found that the expenditure was reasonable, and should be allowed. We have seen that the will contemplated a continuance of the business until all the debts of the firm should be paid. The expenditure may have been injudiciously made, and probably was under the circumstances, but Romanta acted in good faith in making it, and ought not to suffer for an error in judgment. *Syles* v. *Styles*, 2 Wash., C. C., 225; Collyer on Partnership, Sec. 178, note 3. We think there is no ground for complaint in this respect.

The next objection is based upon the following finding of the committee. " There was a claim of title made by other parties covering all the land owned by these parties, situated

Tillotson *v.* Tillotson.

in Louisiana, and a very large amount of other lands belonging to other persons. The firm before the death of Shubael had expended considerable money in resisting this claim, but the claim was most persistently urged after that event, and congressional action was fraudulently obtained in derogation of the rights of this concern and of others in the same interest. In endeavoring to get this action reversed, which endeavor was to an important extent successful, Romanta spent a long time in Washington, and was at large expense, all of which the committee are of the opinion and find was done in good faith, and in strict accordance to his duty for the protection of the concern and the promotion of its interests. The others who shared in the advantages of this expenditure did not contribute to it, but the committee do not find that any blame is attributable to Romanta for this neglect, and they do find that it was his duty to make this expenditure for the interest of the concern, and have allowed his charges therefor. For part of the amount so allowed by the committee the petitioners made this special objection, that the entries of charge made by Romanta at or about the time of the transaction, were too general, and ought for that reason to be disallowed, and especially so inasmuch as he could not at the hearing before the committee give any detailed statement of the entries, and relied solely on the entries themselves. The committee from the whole evidence were satisfied that the entire expenditure was incurred in good faith, and was for the interest of the concern, and therefore allowed it as above stated."

The first objection urged by the petitioners to the allowance of this claim is, that the charge of Romanta did not contain a detailed statement of the various items of which it was composed, but was entirely general in its character, and they claimed that for this reason it should have been rejected. This claim of the petitioners would require us to hold, as a matter of law, that under all circumstances an account of a like nature should be disallowed, notwithstanding the evidence that might be offered to show that it was true. The claim has no reference to the truth or falsity of an account

Tillotson v. Tillotson.

in fact, but demands that a particular charge should be disallowed when found to be composed of two or more items; thus requiring that Romanta, in journeying to Washington, should make a distinct charge of every bill of fare upon every railroad that he might pass over on the way, and every omnibus, hotel or restaurant bill that he had to pay, in order to lay the foundation for recovery; when, to a person of ordinary understanding and experience, the accuracy of the charge could be judged of by ascertaining the distance. Suppose that A should employ B, residing in Connecticut, to go to New Orleans and transact certain business for him; and suppose that B on his return should be unable to give the items of his expenses while absent; would it do to say that he should receive nothing for them, when obviously he must have expended a considerable sum on the way there, and while there, and on his return? But it is said that gross sums will not be allowed in the case of executors and administrators in settling their accounts with the courts of probate; and authorities are cited to that effect. But this arises from the peculiar character of those cases. In their accounts every item may be the subject of appeal. The appeal does not take up the whole case for review, like other cases in other courts where an appeal is allowed, but only the particular matter appealed from, and the remainder stands determined by the court of probate. In other cases before other courts the appeal vacates the judgment, and the whole case goes up to be determined, *de novo*, in the appellate court, but the decision of a court of probate stands till reversed, and when reversed it can be set aside only to the extent appealed from. Hence, in order to give parties interested the right of appeal, it is necessary that every independent item in these accounts should appear separately and distinctly. Should an item of charge be found to be composed of two or more distinct items, and an appeal is taken from the allowance or rejection of only one of them, it is easy to see that great irregularity and confusion would ensue. But in a case like the one under consideration no appeal is allowed. The committee determine questions of fact and the court settles ques-

tions of law, and no confusion can arise if the account is not specific to the extent required of executors and administrators when dealing with the court of probate. We are satisfied that there is no law or practice on this subject that goes to the extent that the petitioners claim. No doubt if an account is kept irregularly and is not specific to the extent that is ordinarily practiced by men of business in like cases, it would weigh against its allowance upon the trial. The triers would require the more evidence in proportion as the mode of making the charges differed from the ordinary practice, before they would be satisfied that it was true. On the other hand, if an account is regularly kept, and every item appears by itself, and purports to have been entered when the transaction took place, it affords strong intrinsic evidence that the account is true. Further than this we do not understand that the law requires us to go. It is a matter to be considered by the committee in connection with all the evidence in the case, in determining the truth or falsity of the account. Swift's Ev., 82; 1 Story Eq. Jur., sec. 468; *Leavenworth* v. *Phelps*, Kirby, 71; *Bevans* v. *Sullivan*, 4 Gill, 383; *Bradley* v. *Chamberlin*, 16 Verm., 613; *Wedderburn* v. *Wedderburn*, 2 Keen, 783; *Crawshay* v. *Collins*, 2 Russ., 325; *Swan* v. *Wheeler*, 4 Day, 137; *Field* v. *Hitchcock*, 14 Pick., 405; *Hughes* v. *Hampton*, 2 So. Car. Const. R., 745; 1 Phill. Ev., 371, 383; 2 Dan. Ch. Pr., 1418, 1426, and note.

Another objection is urged to the allowance of this account, and that is, that the real estate in this case was not partnership property by the laws of the state of Louisiana, by which, it is said, no real estate can become partnership property except by a written contract between the partners to that effect, and that hence the expenditures of Romanta in defending the title to the real estate cannot be brought into his account in settling the transactions of this partnership.

The committee have found that the real estate was purchased out of partnership funds, for partnership purposes— that during the life of Shubael it was treated by the partners as partnership property—that in the last will and testament of Shubael he declared, " I further desire and wish the pro-

perty which is in my name and that which is in my brother Romanta's name to be considered company property and to be equally divided between my family and my brother Romanta's"—that in the same will is the further declaration that Romanta should have the management or principal direction of the business of the firm, and that it should be continued till all the debts were paid or until such time as both parties might desire to dissolve it—and that Romanta continued the business in good faith and in strict accordance with his duty expended the sums under consideration in defending the title from those who were fraudulently seeking to take it away. These are the principal facts that apply to this claim of the petitioners. The question is made between parties interested in the business of the late firm, and as between them we are satisfied that equity requires that the real estate should be considered as a part of the partnership property. Suppose the partnership had been dissolved in the lifetime of Shubael, and similar proceedings had been instituted to settle the affairs of the partnership, and Romanta had presented a claim for the sums of money that had then been expended in this controversy respecting the title. Could Shubael have made the claim that is made here, when the real estate had been purchased by partnership funds for partnership purposes and had been treated as such by both parties for a series of years? Manifestly not. The conduct of the parties would have shown an agreement that the real estate should be considered partnership property, and as between themselves equity would have held that what was agreed to be the property of the firm was such property. Do the petitioners stand in any better relation? We have seen that by the will of Shubael the business of the firm was to continue after his death in the hands of Romanta, and that he was to manage it in the same manner as it had been previously conducted. During the life of Shubael large sums of money had been expended in defending the title of the real estate in the same controversy in which the expenditures in question were made. Under these circumstances would not the petitioners have held Romanta responsible if the title had been lost through his neg-

lect? Could he have shielded himself on the ground that the property did not belong to the late firm and that the petitioners had given him no directions as tenants in common concerning it? It is clear he would have been liable, and his liability would have arisen from the fact that originally the real estate was partnership property in equity, and continued connected with the business of the firm in the hands of Romanta, like other partnership property. His liability could not have arisen from any implied authority given him by the petitioners growing out of the management of the business, for an authority to manage the business of the plantation would not be sufficient to authorize Romanta to defend the title of the land in a controversy before Congress. The labor and expenses of such a controversy would not come within the scope of his employment as manager in raising and selling the products of the plantations; and furthermore, most of the petitioners were minors at the time and consequently were unable to bind themselves by contract. We think therefore this claim is unfounded.

Again the petitioners claim upon this subject, that other lands were benefited by this expenditure—that Romanta in making his defense before Congress acted as a delegate for the persons interested in those lands as well as for himself and the parties interested in this plantation—that he never attempted to collect of them their proportion of this expenditure, but charged the whole in his account with the petitioners, and that consequently such proportion of the account ought to have been disallowed. It appears from the report of the committee that the Houmas claim embraced a large extent of territory, including the lands in question. Romanta could not therefore make a successful defense of the title of this plantation, without its enuring to the benefit of the entire territory. The questions applicable to a portion of the land were applicable to the whole tract, and consequently the owners of the territory made common cause in their defense of the title, and Romanta acted as a delegate of the whole. The committee say that no blame is attributable to him for the failure to obtain from the other persons interested in the

defense their proportion of the expenses incurred, and we think they have decided the whole question.

It is further claimed by the petitioners, that the committee erred in allowing Romanta the sum of $5,000 for services rendered in carrying on the business of the partnership from January 1861 to November 1866, and in this claim we think the petitioners are correct. It appears that there was no express contract between the partners in the lifetime of Shubael for either of them to receive compensation for his services, and that there was none after the death of Shubael between Romanta and the petitioners or either of them ; but on the contrary, that Romanta did not expect remuneration for his services and did not charge for the same during the time that they were rendered. As surviving partner he was not entitled to compensation for services rendered after the dissolution of the partnership, in the absence of an express contract to that effect. Collyer on Part., secs. 199, 328, note ; Story on Part., sec. 331, & note; 3 Kent Com., (5th ed.) 64 ; *Beatty* v. *Wray,* 19 Penn. S. R., 516 ; *Washburn* v. *Goodman,* 17 Pick., 519 ; *Burden* v. *Burden,* 1 Ves. & Beame, 171. And although Romanta, in carrying on the business of the firm as a business under the will of Shubael for the bene fit of the petitioners as well as for himself, and not with the view of closing the affairs of the partnership, seems to have been acting in some other capacity than that of surviving partner, still, taking into consideration all the facts of the case—that no compensation was expressly agreed to be paid in the lifetime of Shubael for services then rendered—that no such agreement existed between Romanta and the petitioners to pay for those services—that Romanta did not expect compensation, and did not intend to charge for his labor " if all had been satisfactory " to him,—and the further fact that Romanta regarded himself as acting in the capacity of surviving partner while rendering the services, we think the committee erred in allowing compensation.

It is further claimed by the petitioners, that the note given by the firm to Woodford was taken up and canceled by Romanta after the partnership was dissolved and a new note

given in lieu thereof, and that, although the new note purported to be a partnership note, still Romanta had no authority to give a note in that form, and that consequently it became his own individual note, and could not therefore be considered by the committee in adjusting the partnership accounts.

The committee find that it was not the intention of either party to the new note to discharge the firm. It had been the practice of the firm to settle with Woodford annually, and Romanta was only following the custom in the several renewals that were made of the note. It is further found by the committee that all the parties in interest have always treated the new obligations as debts of the firm. Under these circumstances we think, as between these parties, the new obligations given by Romanta to Woodford in lieu of the firm note should be treated as a firm indebtedness.

It is further claimed by the petitioners that the renewal notes given by Romanta to Woodford included eight per cent. interest, and were therefore usurious, and the interest forfeited by the laws of this state, where all the transactions took place, although the notes purported to have been given at New River, Louisiana, and that consequently the interest ought not to have been allowed.

The original note, together with the several renewal notes given by Romanta, are dated " New River, Louisiana." This shows that the parties to the notes intended to make them payable at that place, for no other reason can be given why they should have been so dated. Most of the indebtedness had accrued there. Most of the partnership business was then being transacted there. The parties then contracted with reference to the laws of Louisiana. The legal interest in that state was five per cent., but eight per cent. was allowable where parties stipulated in writing to that effect. The original note did not specify any rate of interest, but the partners verbally agreed to pay interest at the rate of eight per cent. When the first renewal note was given Romanta paid the difference between five and eight per cent. and gave a note for the balance that was due. The new note did not

specify any rate of interest, but the subsequent renewal notes did. The law of Louisiana was made for the benefit of debtors. They could not be compelled to pay more than five per cent. unless they had agreed in writing to pay more, but should a debtor waive his privilege and pay more than the legal interest, or give his note for the same when he had agreed at the inception of the note to pay more, the payment or note would be good by the law of that state, for in the one case the transaction would be closed, and in the other the party would have committed to writing the original agreement to pay more than the legal rate. *Rose* v. *Phillips*, 33 Conn., 570. When the renewal note of May 9th, 1856, was given, Romanta paid the excess of interest over five per cent. on the original note of September 9th, 1854, and the transaction was settled and closed to that time. The renewal note of June 19th, 1857, included the principal and interest on the note of May 9th, 1856, at eight per cent., and he agreed in writing to pay the amount. That note specified the interest as eight per cent. and the subsequent renewal notes as seven per cent. In these several settlements with Woodford, Romanta simply allowed the interest that was agreed to be paid when the original note was given. If Shubael was alive he would be bound by the act of Romanta, and surely these petitioners can stand on no better ground.

The petitioners further claim that the indebtedness to Moulton and to M. A. Tillotson, and a part of the Woodford debt, accrued after the death of Shubael, and therefore were improperly allowed in Romanta's account.

If Romanta was authorized by the will of Shubael to continue the business of the firm for a specified time, it would seem to follow that what was necessary to be done in order to continue the business was included. These sums were necessary for the purpose and were properly allowed.

It is further claimed by the petitioners that Romanta sold goods from the plantation while engaged in conducting the business of the firm, and took in payment therefor worthless obligations called "Parish Ascension Scrip," and therefore

Tillotson *v.* Tillotson.

that the committee erred in allowing this to be good accounting.

The court finds that the scrip was current money at the time and place where Romanta took it, and we see no cause for complaint on this ground. The question was one of fact for the committee to determine, whether under all the circumstances Romanta conducted fairly in this respect, and with a reasonable degree of diligence to protect the interests of the petitioners.

We think, therefore, that the superior court must be advised to disallow the charge. of salary allowed by the committee to Romanta, and to correct and amend the report so far as the rejection of this item may make it necessary, and when thus amended to accept the report, and pass a decree ordering the property of the concern, both real and personal, to be sold, the debts to be paid, and the balance to be distributed to the parties in interest in proportion to their several shares therein.

In this opinion HINMAN, C. J., and McCURDY, J., concurred. BUTLER and CARPENTER, Js. were absent.